UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | Docket No. 2:16-cr-165-DBH |
| ) | |
| DAVID W. MILLER ) | |
| ) | |
| Defendant ) | |

# SENTENCING MEMORANDUM
# OF DEFENDANT DAVID MILLER

The undersigned wishes to make four principal points with this sentencing memorandum:

First, the crimes which Defendant Miller has admitted to occurred more than 22 years ago (during the summer of 1995). Since that time he has lived a generally peaceful and quiet life. The man whom the Court shall be sentencing is a very different man than the one who committed the drive-abouts in 1995.

Second, Miller is a complex man, whose life has been informed by childhood abuse and by traumas experienced during the course of his lengthy military service.

Third, the Sentencing Guideline calculation proposed in Probation's Pre-Sentence Report overstates Miller's appropriate USSG sentencing exposure. Miller should not be sanctioned for the alleged use of "physical force" or threats or drugs in the conduct of the

drive-arounds, which he denies and which was not contained within the four-corners of the discovery produced by the Government to date.

Fourth, a downward departure is appropriate if the USSG calculation results in a sentencing range above the statutory minimum.

**Read together, the undersigned prays that Miller be sentenced at the statutory minimum.**

## 1.
## The Offense Charged is Remote.

This Court holds profound and awe-inspiring power in those areas where it is vested jurisdiction to act. One such area is criminal sentencing: With a few words from the Bench, a man can be separated from his life and his family and his dreams -- for the balance of his life, or what shall pass as the balance of his life.

That terrible power must be exercised wisely.

The gravity of the offense must be balanced with the circumstances of the man to be sentenced.

David Miller is <u>55</u> years old. He committed the offense for which he has pled guilty more than 22 years ago, when he was <u>32</u>. Two decades have passed since the criminal conduct asserted in this prosecution. During most of those two decades he has resided with his fiancée, Samantha D., in Michigan. During those two decades, Miller had no inappropriate contact with the victim here (J.B.). Indeed, in 2004, J.B. reached out to Miller ó without any solicitation from Miller -- and attempted to re-integrate

2

herself into Miller's life and move back in with him.  J.B. presumably would have moved in with Miller in 2004 but for the fact that, by then, Miller was already residing with Samantha D.

The victim J.B. alone caused the delay in the prosecution.  For whatever reason, she sat on her allegations for two decades.  Miller did nothing to delay this prosecution.  The Government has known where he has resided for every minute of the past twenty two years.

When confronted with J.B.'s allegations in October 2016, Miller immediately and unequivocally confessed to his wrongdoing.

It is anticipated that Samantha D. shall appear and testify at sentencing that David is a kind and loving man, who resides peacefully in their shared home in Michigan, whose passions include playing the drums, NASCAR and spending time with Samantha's family.  Samantha D. wishes to marry Miller (and he her).  The couple had planned to be married during the period of Miller's incarceration, but the Government has opposed the marriage.  Samantha shall testify at hearing that she has no fear for her safety and well-being in Miller's company, nor for the safety and well-being of her daughter Felicia (who has lived with Miller and Samantha at times) or granddaughter J.J.

Samantha D. has stated to the undersigned that the "David [Miller she] know[s] wouldn't hurt a fly".

As shall be demonstrated at sentencing hearing, during those two decades, Miller has lived a largely peaceful and law-abiding life.  His last conviction was in 2003.  His last criminal allegation of any kind occurred in 2004 (a non-prosecuted domestic violence charge in Michigan).  Four of Miller's five convictions of record [PSR at paras. 33-37]

3

occurred during a two-year period of obvious strife during his marriage to Rose, in Maine. The fifth, a 2003 domestic violence incident involving Samantha D., was õset asideö and dismissed by the Michigan court through a diversionary disposition.

Thus, the Court faces a sentencing dilemma: How to balance admittedly heinous conduct, albeit in the remote past, with a man who has sought and obtained redemption over the past two decades.

Redemption and second chances are the stuff of great novels and greater philosophy.

Guidance can be found in the Section 3553 sentencing factors.[1]

---

[1] The Court is well aware of the Section 3553 sentencing factors, however, they are re-stated herein out of an abundance of caution and to build the appropriate record in the event of appeal: (1) the nature and circumstances of the offense, (2) the history and characteristics of the defendant, (3) the need for the sentence imposed to reflect the seriousness of the offense, (4) to promote respect for law and to provide just punishment for the offense, (5) to afford adequate deterrence to criminal conduct, (6) to protect the public from further crimes of the defendant, (7) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner, (8) the need to avoid unwarranted sentencing disparities, and (9) to provide restitution to the victims. *See* Title 18 U.S.C. §3553(a), *United States v. Booker,* 543 U.S. 220 (2005); *Kimbrough v. U.S.,* 552 U.S. 85 (2007).

Congress has directed that the district court "shall impose a sentence sufficient, *but not greater than necessary,* to comply with (the purposes of sentencing" (emphasis added). 18 U.S.C. § 3553(a). This is the "primary directive" of the sentencing statute. *Koon v. U.S.,* 518 U.S. 81, 113 (1996) ("[i]t has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensueö).

The court may now even consider those mitigating factors that the advisory guidelines previously prohibited, for example: poverty, racial discrimination and humiliation, drug abuse and addiction and a dysfunctional family background and lack of guidance as a youth. *U.S. v. Jimenez- Beltre,* 440 F.3d 514, 524, 527 (1st Cir. 2006) *United States v. Ranum,* 2005 WL 161223 (E.D. Wisc. Jan. 19, 2005) ('The guidelines' prohibition of considering these factors cannot be squared with the

4

Factors (2), (4), (5), (6) and (7) particularly warrant consideration in the light of the passage of two decades since the commission of the drive-arounds.

- **(2) The history and characteristics of the defendant –** Miller is a middle-aged, quiet man at this point. To the extent that he was a "sexual criminal" at one point long ago, he is no longer. To the extent that Miller's history and characteristics are meant to measure the risk of recidivism [presumably the principal reason for their consideration] there is absolutely no evidence of any potential recidivism risk at this point.

- **(4) To promote respect for law and to provide <u>just</u> punishment for the offense –** The old saw "justice delayed is justice denied" must be read both from the perspective of the victim, as well as of the perpetrator. Here, it is the victim (J.B.) -- and not Miller -- who caused the twenty two delays in justice. As discussed above, for whatever reason, J.B. sat on these allegations for two decades. Miller has never run from the allegations. Again, when confronted with them (in October 2016), he confessed to his wrongdoing immediately. Yet it is Miller, and not J.B.,

---

Section 3553(a)(l) requirement that the court evaluate the "history and characteristics" of the defendant"); *U.S. v. Myers* 2005 WL 165314, *2 (S.D. Iowa, 2005) ("The guidelines' prohibition of considering these factors cannot be squared with the § 3553(a)(l) requirement that the court evaluate the "history and characteristics" of the defendant....Thus, in cases in which a defendant's history and character are positive, consideration of all of the § 3553(a) factors might call for a sentence outside the guideline range"). *See also* 18 U.S.C. § 3661 ("no limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence" (*Booker,* 543 U.S. 220).

who suffers any sanction for the two decades' delay in reportage. Punishment is magnified (and less just) when it is remote from the crime. Miller has built a life over the past two decades, in a different state, with a different family. That positive momentum is being cast aside as the court reaches back to the 1990's and now disrupts Miller's life.

- **(5) To afford adequate deterrence to criminal conduct –** "Adequate" deterrence implies that the punishment is measured with the offense. The twenty-two year delay in justice here renders any sentence in this case so *sui generis* as to decouple it from any notion of rational society-wide deterrence. Any sentence here will necessarily be an outlier.

- **(6) To protect the public from further crimes of the defendant –** At this point, Miller is a middle-aged, quiet man. He has not even been accused of any crime in thirteen years, nor prosecuted for any in fourteen years. He poses no danger to anyone. There is no evidence of any risk of recidivism.

- **(7) To provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner –** Miller is retired. He is old. He offers no palette for educational or vocational training. To the extent that he has medical and mental health needs, same can be (and have been for two decades) addressed in the VA system.

6

The two-decades separation between the drive-abouts and the prosecution of this case argue compellingly for a vastly reduced sentence.

## 2.
### Emotional/Psychological Issues.

The undersigned has provided Probation with lengthy psychiatric/psychological/emotional records, including more than 3 dozen separate evaluations and assessments from the VA.

Additionally, the defense has engaged Carlyle Voss M.D., a Portland-based psychiatrist who is presumably well known to the Court. Dr. Voss has reviewed the voluminous records which have been produced to Probation, including õcomprehensive evaluations, neuropsychological and personality tests and treatment notes" [as quoted from reportage from Dr. Voss to the undersigned].

It is anticipated that Dr. Voss will make the following points to the Court at sentencing:

1. Miller reports being severely sexually abused over a prolonged period of time by a Cub Scout leader during his childhood;

2. Miller attributes much of his subsequent life difficulty to that and to other traumatic experiences which he experienced, including trauma experienced during his military service;

3. Miller attributes his PTSD to his childhood sexual abuse (CSA) and to his military experience;

7

4. Miller exhibits mental, emotional and behavioral symptoms that are more frequently seen in persons with PTSD than in persons who do not have that diagnosis;

5. Symptoms which Miller reports which are more common in persons suffering from PTSD than in persons who do not include substance abuse (particularly alcohol abuse),difficulties in relationships/personality disorders, emotional dyscontrol (particularly anger) and distress when reminded of underlying traumas. Survivors of CSA.

Dr. Voss has provided to the undersigned, and the undersigned has attached hereto and incorporate herein as Exhibit "A" hereto, a study entitled "Darkness to Light" which provides a comprehensive review of CSA with 92 references.

Like the temporal remoteness of this prosecution, Miller's traumatic past, including his CSA and the trauma experienced in the course of his military service, argue compelling for a vastly reduced sentence.

### 3.
### The Guideline Calculation.

As a threshold matter, it was settled at the pre-sentence conference herein that the 1994 Guidelines [rather than the 2016 Guidelines as proposed by the government] govern the Court's USSG calculation in this case, insofar as the application of Guidelines promulgated twenty two years after the involved offense would certainly violate the *ex post facto* clause of the United States Constitution.[2]

---

[2] *See United States v. Havener,* 905 A.2d 3 (1st Cir. 1990) ("[Although] as a general matter, the 'law in effect' canon would seem to govern matters of procedural law, and substantive civil law; it does not

8

### A. The Court should not apply the Section 2G1.2(b)(1) enhancement.

Miller maintains that the Court should not apply the 4-point Section 2G1.2(b)(1) enhancement derived from the 1994 Guidelines. Miller maintains that the offense did not involve the use of physical force, or coercion by threats or drugs. There is no mention of the use of physical force or coercion by threats or drugs in the "Prosecution Version" [Dkt. No. 66][3]; Miller would not have agreed to the content of the prosecution version if there had been such mention. He denies that he ever employed physical force, threats or drugs in any manner whatsoever to obtain J.B.'s compliance with the 1995 drive-arounds, or to obtain sex during those drive-arounds. Moreover, there is no evidence in the statements generated by J.B. nor in her grand jury testimony specifically linking physical force, threats or drugs to the subject drive-arounds.[4]

---

ordinarily apply in the context of substantive criminal law. That is because the Constitution's *ex post facto* clause forbids the application of any law or rule that *increases* punishment to preexisting criminal conduct. U.S. Const. Art. I, § 9, cl. 3; *cf.* U.S. Const. Art. I, § 10, cl. 1, citing to *Miller v. Florida*, 482 U.S. 423, 429-35 (1987) holding that application of revised Florida guidelines law, which increased punishment for crimes in question, to defendant whose crimes occurred before the law's effective date, violated the *ex post facto* prohibition).

[3]    The "Prosecution Version" states in pertinent part:

During the summer of 1995, the Defendant, then age 33, who was working as a long haul truck driver for Werner Enterprises ("Werner"), took J.B., his adopted thirteen-year-old daughter, with him during two interstate trips in June and July, respectively. Based on records obtained from Werner, the Defendant and J.B. signed forms, which requested authorization for the Defendant to take J.B. on the road with him during the two trips (from June 12 – July 12, 1995 and from July 12 – August 12, 1995).

During these two trips when he transported J.B. from Maine through multiple states, including Nebraska, the Defendant intended for J.B. to engage in illegal sexual activity. Specifically, while transporting J.B. interstate, the Defendant, who was above the age of 19, intended to subject J.B., who was between the ages of 12 and 16, to sexual penetration. During time in Omaha, Nebraska, the home of Werner headquarters, the Defendant and J.B. stayed nearby at the Benjamin Franklin Motel. At the time, this motel had a kite-shaped outdoor pool. The Defendant subjected J.B. to sexual penetration, in violation of Nebraska Revised Statute 28–319(1)(c), during both trips while staying at the Benjamin Franklin Motel. [Citation to pertinent Nebraska statute omitted.]

[4]    Read charitably to the Government, J.B. may fairly be said to have complained that Miller beat her and raped her on various occasions throughout her childhood [statements, GJ transcript *passim*]. But she never complained – with respect to the 1995 drive-abouts *specifically* (which are, of course, the subject matter of this prosecution) – that any physical force was employed upon her during the drive-abouts. J.B.'s

9

To the extent that the Government shall seek to expand the sentencing record at the sentencing hearing – presumably through the testimony of J.B. – to present evidence of physical force, threats or drugs during the drive-arounds notwithstanding the absence of same in the record to date, the undersigned submits that same would violate Miller's constitutional rights: Since 2000, federal jurisprudence has recognized that factual determinations which significantly increase sentencing exposure both need to be predicated on facts disclosed <u>in discovery</u> (none were here) and, more importantly, <u>be subjected to jury determination</u>. *See, e.g.*, *Blakely v. Washington*, 542 U.S. 296 (2004), *Apprendi v. New Jersey,* 530 U.S. 466, 490 (2000) and their progeny.

USSG 2G1.2(b)(1) dictates that the sentencing court measure coercion – whether by physical force, threat or drugs -- by its application to obtain the drive-arounds, rather than the sex itself. *See,* among many, *United States v. Ellis,* 935 F.2d 385 n. 9 (1st Cir. 1991); *United States v. Campbell,* 49 F.3d 1079 (5th Cir. 1995).

Even measured in such a fashion, no coercive physical force, threats or drugs was employed to achieve the drive-arounds.

---

only reference to physical force at all during the 1995 drive-abouts relates to a fight which she and Miller purportedly got into arising out of her obtaining of a paper bag from a convenience store during a stop in Ohio, rather than a plastic bag which Miller preferred for purposes of lining the truck's trash receptacle [GJ transcript at pp. 33, 37-41].

J.B. did assert that she never complained about her sexual abuse by Miller because he had made certain undefined "threats" against her half-sisters [GJ transcript at pp. 13, 15], who were very important to her. However, J.B. never tied those vague threats, which allegedly constrained her reportage of the alleged abuse for many years, to the 1995 drive-abouts.

While it is certainly true that J.B. had no way to escape Miller once she commenced upon the ride-abouts, that pragmatic circumstance is neither the exercise of "physical force" or the overcoming of her will be threats or drugs.

10

### B. The Court should not apply the 4-point enhancement articulated in Probation's Section 2A3.1 cross-reference.

By the same analysis discussed immediately above, given the absence of any coercive physical force, threats or drugs, the 4-point enhancement articulated in Probation's Section 2A3.1 cross-reference is likewise inapplicable.

The highest offense level achievable through Probation's calculus absent the said 4 –point enhancement [even cross-referencing to USSG 2A3.1] is 31 which, at criminal history II, results in a sentencing range of 121-151.

Even at that sentencing level, Miller shall seek – and the extant circumstances compel – a downward variant sentence.  *See* Section (4), immediately below.

### 4. A Downward Variant Sentence Is Appropriate Here.

The Court should grant a variant sentence downward if and to the extent that the Court finds a Guideline range above 120 months.  Miller has filed a separate motion for a variant sentence, predicated upon circumstances identified by Probation (PSR at Para. 77) including Miller's supportive family and his military service.

The Court should <u>not</u> entertain any upward variance.  The Government argues that Miller's criminal history understates his criminality and that the charged conduct involves aggravating circumstances, extreme psychological injury and extreme conduct.  *See* PSR at Para. 74.

That argument failures on two levels.  First, the Government is forgetting that the only conduct which Miller stands convicted of is the 1995 drive-arounds.  He denies the

11

pattern of extreme cruelty (to J.B. and others) which the Government seeks to foist upon the Court. It is manifestly unfair – and a clear violation of law – for the Court to elevate fairly pedestrian convicted conduct into much more by use of denied, unproven assertions.[5]

Second, the Court should be mindful of Judge Gertner's analysis of a similar motion for upward departure predicated upon the understatement of criminal history, in *United States v. Footman,* 66 F. Supp. 2d 83 (D. Mass. 1999) at pp. 100, 101:

> To be sure, just because the Guidelines seem to give a judge the discretion to look to criminal conduct rather than convictions, it does not mean that a judge should do so. Once one ventures past formal convictions, and formal sentences, one is in troubling territory. How can the court reconstruct prosecutions long past? Should the court essentially retry the past conduct, or rely on police reports which may well be skewed? And if a matter has been dismissed, or worse, resulted in an acquittal, how can the court, many years hence, substitute its judgment for that of the original decision-maker?
>
> To the extent that I based my original upward departure on "prior criminal conduct" that did not result in a conviction, I wish to reexamine it. I will first analyze Footman's record looking only at the convictions and the inferences that may be drawn from them. Based on that reexamination alone, without more, I conclude that there is a substantial basis for departing upward three levels. I will address these issues in section (2) below.
>
> At the same time, this case is unique in the amount of reliable information that I have with respect to Footman's record. I listened to the sworn testimony of a witness who, in response to defense questions, described the defendant's criminal conduct towards her, the charges she pressed against him, and why she did not go farther. She feared, she

---

[5] The Court will recall that, during hearing on Miller's comprehensive motion *in limine,* the Court gave guidance that it was inclined to exclude from trial allegations of sexual/physical abuse to third-parties and to limit testimony respecting abuse of Rose M. (Miller's wife during times relevant) to the extent to which it frightened J.B. or gave her a reason not to contemporaneously report the abuse which she purportedly sustained.

12

> said, that he would kill her. I also listened to the defendant's own words in conversations with some of the women who worked for him, and other pimps, in which he talks about his record, and his intent to continue to commit crimes.
>
> In effect, the Guidelines treat criminal convictions as providing circumstantial evidence of recidivism. Courts seek to draw inferences about future conduct from past convictions. The inference that I have drawn from Footman's record is that recidivism is quite likely, indeed, more likely than the score suggests; and further, that his record undervalues his culpability.

Judge Gertner upward departed in *Footman.* The Court predicated its decision on its sense that that history suggested future recidivism: Footman's criminal history suggested a meaningful future risk of recidivism.

**Miller is an old, quiet man, long past his age of criminality.**

**There is no evidence of future risk of recidivism.**

The questions which Judge Gertner asked herself, if asked by this Court to itself, compel that no upward variance be made.

**The defense prays that Miller be sentenced at the statutory minimum.**

Dated at Lewiston, Maine this 13th day of September, 2017.

/s/David Van Dyke, Esq.
Lynch & Van Dyke, P.A.
261 Ash Street - P.O. Box 116
Lewiston, Maine 04243-0116
Tel. 207-786-6641
dvandyke@HLRVD.com

13

## UNITED STATES DISTRICT COURT

## DISTRICT OF MAINE

I hereby certify that on September 13, 2017, I electronically filed the within

## SENTENCING MEMORANDUM
## OF DEFENDANT DAVID MILLER

using the DM/ECF system which will send notification of such filing to Assistant United States Attorney Darcie McElwee, and I hereby certify that same shall be timely mailed by United States Postal Service to Defendant David Miller.

>/s/ David Van Dyke, Esq.
>Lynch & Van Dyke
>261 Ash Street - P.O. Box 116
>Lewiston, Maine 04243-0116
>Tel. 207-786-6641
>dvandyke@HLRVD.com

14